J-S24044-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| L.A.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.W.G., JR. | : | |
| | : | |
| Appellant | : | No. 36 WDA 2017 |

Appeal from the Order December 7, 2016
In the Court of Common Pleas of Clearfield County
Civil Division at No(s): 2013-2003-CD

BEFORE: PANELLA, STABILE, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED MAY 22, 2017**

Appellant, J.W.G., Jr. ("Father"), files this appeal from the order dated December 7, 2016, and entered December 8, 2016, in the Clearfield County Court of Common Pleas by the Honorable Paul E. Cherry, denying his petition for modification of custody of son, J.W.G., III, born in February of 2001, and daughter, L.G.G., born in August of 2010 (collectively, the "Children"), and maintaining primary physical custody with L.A.G. ("Mother") and partial physical custody with Father. After review, we affirm the trial court's order.

The trial court summarized the relevant procedural and factual history as follows:

---

[*] Former Justice specially assigned to the Superior Court.

Mother and Father separated in November of 2013. After being unable to agree to a custody arrangement for the children, Mother filed a Complaint for Custody on December 2, 2013. The [c]ourt thereupon ordered the parties to participate in a custody mediation conference, which was held on February 7, 2014. Said mediation ultimately proved to be fruitless. Therefore, a Custody Trial was held on May 14, 2014, which culminated in this [c]ourt's Order dated June 25, 2014. Pursuant to the June 25, 2014 Order, the parties were awarded joint legal custody and Mother was awarded primary physical custody of the children subject to periods of partial custody with Father. The Order, which remains in effect, grants Father periods of partial custody every other weekend and overnight every Wednesday during the school year. During the summer months, the Order provides that the parties alternate physical custody on a weekly basis. Additionally, the Order sets forth a shared holiday arrangement for the custody of the children.

On March 23, 2015, Father filed a Petition for Modification seeking primary physical custody and full legal custody of the children. Following Mediation, Father filed a Motion for Custody Evaluation on August 3, 2015 and an Amended Motion for Evaluation on August 13, 2015. Pursuant to Order of [c]ourt dated September 8, 2015, which was entered by agreement of the parties, the [c]ourt ordered an evaluation with Bobbie [*sic*] Dawley Kissman (hereinafter "Ms. Kissman"), a licensed psychologist. Said evaluation began in late October, 2015 and concluded on December 30, 2015. [Ms.] Kissman's custody evaluation was then provided to the [c]ourt and to counsel for parties on or about January 14, 2016.

Trial Court Opinion and Order, filed 12/8/16, at 1-2.

The trial court conducted hearings with regard to Father's petition over three days, June 30, 2016, July 27, 2016, and July 28, 2016. Father and Mother, who were both represented by counsel, each testified on their own behalf. The trial court additionally heard from: Bobbi D. Kissman, licensed

psychologist, who conducted a custody evaluation;[1] Danielle Mangene, Director of Childcare, Calvary Kidcare, where L.G.G. attended preschool; C.G., paternal aunt; W.D.H., Jr., Mother's boyfriend; and G.G., maternal grandfather.[2]

By order dated December 7, 2016, and entered December 8, 2016, the trial court denied Father's petition for modification of custody.[3] The trial court maintained primary physical custody with Mother and partial physical custody with Father. As it relates to Father's physical custody of the Children, the trial court altered Father's physical custody of L.G.G. during the school year.[4] Further, the trial court found that Father's physical custody of J.W.G., III, should be as agreed by Father and child. The trial

---

[1] Ms. Kissman's report was marked and admitted as Defendant's Exhibit 2 on June 30, 2016.

[2] The trial court also interviewed the Children on July 28, 2016. **See** Notes of Testimony ("N.T."), 7/28/16, at 18. Upon review of the certified record, these interviews were not transcribed. However, neither party raises this as an issue, nor do they suggest any dispute as to the Children's statements.

[3] The trial court issued an opinion with its order addressing each of the factors enumerated in 23 Pa.C.S. § 5328(a) and, upon appeal, did not issue a supplemental or further opinion. **See** Trial Court Opinion and Order, filed 12/8/16, at 1-13; Letter, 1/9/17.

[4] During the school year, Father was awarded physical custody of L.G.G. every other Wednesday from the end of the school day until the end of the school day on Thursday, and on Friday after school until Sunday at 8:00 p.m. On the alternate weeks, in which Father does not have Wednesday through Thursday and weekend custody, Father was awarded custody on Tuesday and Thursday from 4:00 p.m. to 8:00 p.m. Trial Court Opinion and Order, filed 12/8/16, at 13.

court additionally directed Father, Mother, and J.W.G., III, to attend counseling and comply with all recommendations therein. On January 3, 2017, Father, through counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

I.   Whether the [t]rial [c]ourt abused its discretion in failing to recognize that Mother's conduct revealed a pattern of her failing to promote and encourage a relationship between the children and Father?

II.  Whether the [t]rial [c]ourt abused its discretion in finding that Mother had not attempted to turn the children against their Father?

III. Whether the [t]rial [c]ourt mischaracterized the expert report of the custody evaluator in order to support its decision to award Mother primary physical custody of both children?

IV.  Whether the [t][rial [c]ourt abused its discretion in finding, after review of the custody factors set forth in 23 Pa.C.S.[] § 5328, that the best interests of the children would be served by Mother retaining primary physical custody?

Father's Brief at 5.

Our standard of review with regard to a custody matter is well-settled:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the

conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***V.B. v. J.E.B.***, 55 A.3d 1193, 1197 (Pa.Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." ***S.W.D. v. S.A.R.***, 96 A.3d 396 (Pa.Super. 2014) (citation omitted). The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S. § 5328(a).

***E.R. v. J.N.B.***, 129 A.3d 521, 527 (Pa.Super. 2015).

Section 5328 provides as follows:

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

As it relates to expert testimony, we have stated:

[W]hen expert evaluation is uncontradicted or unqualified, a child custody court abuses its fact

finding discretion if it totally discounts expert evaluation. To say that a court cannot discount uncontradicted evidence, however, is merely to rephrase the requirement that a child custody court's conclusion have competent evidence to support it. So long as the trial court's conclusions are founded in the record, the lower court [is] not obligated to accept the conclusions of the experts.

**Nomland v. Nomland**, 813 A.2d 850, 854 (Pa.Super. 2002) (citations and a quotation omitted). It is not this Court's function to determine whether the trial court reached the "right" decision; rather, we must consider whether, "based on the evidence presented, given due deference to the trial court's weight and credibility determinations," the trial court erred or abused its discretion in awarding custody to the prevailing party. **Hanson v. Hanson**, 878 A.2d 127, 129 (Pa.Super. 2005).

**King v. King**, 889 A.2d 630, 632 (Pa.Super. 2005). Further, "the weight to be given to [expert] testimony is for the trier of fact." **Rittenhouse v. Hanks**, 777 A.2d 1113, 1116 (Pa.Super. 2001) (citation omitted).

We consider Father's first three issues together as we find they are interrelated in that they all pertain to Mother's alleged failure to foster a relationship between and/or attempts to alienate the Children from Father. Essentially, Father challenges the trial court's consideration of Section 5328(a)(1) and (8), and its utilization of expert opinion.

In reviewing Section 5328(a)(1), which party is more likely to encourage and permit frequent and continuing contact between the child and another party, and determining that it weighed in favor of Mother, the trial court indicated that Mother had not denied Father any custodial time. Trial Court Opinion and Order, filed 12/8/16, at 3. In fact, the trial court found instances where Mother had offered Father additional custodial time. **Id.**

- 7 -

The trial court additionally highlighted that Mother appeared to be the more willing and effective communicator. *Id.* at 4. Specifically, the trial court stated as follows:

The [c]ourt will first examine who is more likely to encourage and permit contact between the children and the other party. 23 Pa.C.S.[] § 5328(1). During the hearing on this matter, it appeared to the [c]ourt that Mother does continue to encourage and permit frequent and continued contact between the children, particularly [L.G.G.] and Father. While it is important to note that Mother does not permit Father to see his children upon each of his requests, Mother still allows the children to see Father at times outside of Father's [c]ourt[-o]rdered periods of partial custody. Further, no evidence was presented to suggest that Mother denied Father any of his regularly scheduled periods of partial custody. Father, however, has claimed that Mother has consistently refused to grant him additional time with the children, primarily [L.G.G.], since the entry of the June 25, 2014, Order. Father presented the [c]ourt with an exhibit purporting to be all of the times that he requested additional time with [L.G.G.] that were not granted and claimed that there have only been two (2) occasions when Mother has granted him extra time with [L.G.G.] Mother's testimony was that she has granted Father periods of additional time beyond what is in the current Order, though she testified that she did not keep a calendar of those occasions because she had not thought it was necessary to do so. In this regard, the [c]ourt finds Mother's testimony to be credible.

Mother also testified that she offered Father the opportunity to watch [L.G.G.] on Tuesdays for a period of three (3) months, January through March, 2016, while she worked. This was time when maternal grandparents would normally have babysat, but they were going to be unavailable during that time period. Mother texted Father this offer in November, 2015. However, when she did not hear back from him, she arranged for [L.G.G.] to attend preschool for an extra day during those three (3) months.

Father also claims that [M]other is unresponsive to his requests and evidences that by extensive text records. Mother also supplied the court with extensive text records showing text message communications between the parties. What those text

records do not show are the other communications between the parties either in person or by phone. Mother testified that she regularly tried to communicate with Father by telephone to discuss issues with the children; however, Father would not cooperate in communicating in that fashion.

The testimony of [Ms.] Kissman also indicated that the parties have communication difficulties, but that Mother ultimately appears more willing to initiate communication than Father. Father, in his testimony, acknowledged that Mother has tried to communicate with him through ways other than text messaging. It would, therefore, appear that many of the difficulties the parties face when attempting to effectively communicate do not stem from Mother's unwillingness to try to do so.

Father has, at times, failed to effectively communicate with Mother regarding important issues. One such incident involved a knee injury suffered by [J.W.G., III,] while he was in Father's custody. [J.W.G., III,] is a hemophiliac, which gives rise to special concerns when he suffers an injury. Father's testimony was that he did not feel the injury was serious; therefore, it was not necessary to notify Mother about the incident. Father also claimed that the injury was aggravated by a subsequent injury at school, which required Mother to pick [J.W.G., III,] up later in the week. Mother testified, however, that she was entirely unaware of the injury until she was told by [J.W.G., III,] the following Saturday when his knee was severely swollen. Mother also testified that there was never an incident at the school involving the knee injury that required her to pick up [J.W.G., III]. The end result of the knee injury was that [J.W.G., III,] required a series of ongoing medical treatments to address the issue, and Mother was not informed about the injury by Father.

Father also complained about incidents when he was unable to talk to [L.G.G.] on the phone. It would appear that most of these incidents occurred in 2014. Mother's testimony was that she also had trouble talking to [L.G.G.] on the phone at that time, as [L.G.G.] was then only four years old and did not necessarily cooperate with either party when being asked to talk on the phone. This would likely have been the case when Father attempted to speak with [L.G.G.] on her fourth birthday. There did not seem to be any testimony on either side that phone contact with [L.G.G.] continues to be an issue.

Father has also alleged that he is not being involved in the decision[-]making with regards to [L.G.G.]'s activities. Father seems to feel as though he should be consulted and must approve of any activity that the child does, even when those activities are during Mother's periods of primary physical custody of the child. While Father should certainly be involved in major decisions that impact [L.G.G.], namely those involving [L.G.G.]'s health, education, religion, etc., other extracurricular activities that do not infringe upon Father's time do not necessarily need Father's consent and approval.

Ultimately, although, Mother has at times refused to permit Father additional time when asked, there is also evidence of Mother allowing Father to spend extra time with his children outside of his [c]ourt[-o]rdered periods of partial custody. Additionally, as Mother is more likely to initiate and maintain open communication, this factor weighs against Father's request to modify the current custody order.

*Id.* at 3-5.

Further, in addressing Section 5328(a)(8), the attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm, and concluding a lack of attempted alienation on the part of Mother and her extended family, the trial court noted:

In his Petition for Modification, Father has alleged that "Mother and her extended family, through various actions, have previously caused alienation between Father and the Children." The testimony of [Ms.] Kissman, however, refuted this notion. Specifically, [Ms.] Kissman stated that [L.G.G.] did not seem to be affected by the animosity between the parents in their high conflict custody case, and that she seemed to be fairly unaffected by the disharmony between her parents. This would then seem to indicate that [L.G.G.] does not exhibit any alienation from Father at this time.

[Ms.] Kissman's testimony also did not indicate that [J.W.G., III,] appeared to be alienated from Father. Specifically, when asked about Father's allegations concerning Mother's and

maternal family's efforts to alienate Father, [Ms.] Kissman testified that [J.W.G., III,] did not present as an alienated child to her. [Ms.] Kissman, rather, found that [J.W.G., III,] was sad that he does not have a positive relationship with his Father, but she did not find alienation.

It is important to note that following [Ms.] Kissman's evaluation, and by the time the [c]ourt was able to interview [J.W.G., III], [J.W.G., III,]'s relationship with his Father had changed. After the evaluation process with [Ms.] Kissman, [J.W.G., III,] began to refuse to go to his regularly scheduled periods of partial custody with Father. [J.W.G., III,] did, however, participate in counseling with Father. Those sessions were set up and held with licensed clinical social worker Daisi Eyerly. When [J.W.G., III,] expressed views of the situation, he appeared to feel as though Father would make promises to him that he had no intention of keeping.

The evidence that has been presented to the [c]ourt by all parties does not appear to establish any attempt at alienation on the part of Mother or Mother's extended family. Instead, it would seem as though [J.W.G., III,]'s strained relationship with Father is due only to the interactions he has had with Father.

*Id.* at 9-10.

Father, however, argues that the trial court erred in failing to consider behaviors which suggested a pattern of Mother failing to promote and encourage a relationship between the Children and Father. Father's Brief at 9. As maintained by Father, "The [t]rial [c]ourt abused its discretion in ignoring a vast amount of evidence which clearly revealed a settled purpose on behalf of Mother to cause a divide in the relationship between Father and the children." *Id.* at 10. Father points to examples of conduct of not only Mother, but her extended family, which he claims were ignored by the trial court. *Id.* Father suggests these behaviors were meant to create a rift between he and the Children. *Id.* at 13.

Moreover, and more importantly, Father contends that Mother achieved her goal and alienated J.W.G., III, from Father. *Id.* at 14. He states:

> The [t]rial [c]ourt was presented with evidence which showed Mother's conduct adversely affected the relationship between Father and the oldest child. Mother has had custody since June 25, 2014. Under her watch, she has done numerous acts to limit Father's time with the children or not promote a relationship between Father and the parties' son. The end result was that Mother was successful in severing the relationship between Father and son.

*Id.*

Additionally, in relying on the findings of Ms. Kissman with regard to its determination with respect to alienation, Father argues that "[t]he trial court mischaracterized the uncontradicted factual conclusions and observations of the expert witness, [Ms.] Kissman, which amounts to an abuse of discretion." *Id.* at 15. According to Father, a conclusion of no alienation is "inconsistent with the unqualified findings of [Ms.] Kissman."[5] *Id.* at 17. Father proffers the following:

> [Ms.] Kissman stated throughout her report and testimony that Father's concerns had merit. She also testified that the reason she did not find [J.W.G., III] to be an alienated child was the fact that he wished to repair his relationship with Father. The cessation of time with Father after the evaluation was complete shows that there is a severe separation present. Whether or not the child was actually alienated, however, the

---

[5] Father limits this argument to Ms. Kissman's findings as to alienation. He does not explore Ms. Kissman's recommendations with regard to custodial time. *Id.* at 15-18.

> trial court clearly ignored [Ms.] Kissman's findings showing that Mother and her family attempted to cause a divide between Father and the oldest child.
>
> The [t]rial [c]ourt picked statements from the testimony and report of [Ms.] Kissman to support its position, and ignored and/or mischaracterized her overall findings and conclusions. The trial court committed an abuse of discretion by ignoring the uncontradicted and unqualified findings of attempts at alienation and used [Ms.] Kissman's report and testimony, out of context, to support its position.

*Id.* at 17-18. We disagree.

In the case *sub judice*, the record supports the trial court's determinations and we, therefore, discern no abuse of discretion. No evidence was presented that Mother denied Father of any custodial time as provided by court order. Moreover, Mother was willing to arrange additional custodial time. N.T., 7/27/16, at 7. Father acknowledged at least two occasions where he was afforded additional custodial time with L.G.G. N.T., 6/30/16, at 63, 112. Although Father was quick to suggest that Mother declined his requests for additional custodial time with the Children outright or just did not respond, Mother testified to occasions where she attempted to contact and respond to Father in manners other than text message, *i.e.* telephone call.[6, 7] N.T., 6/30/16, at 62; N.T., 7/27/16, at 8, 28. In addition,

---

[6] Father admitted he was unreceptive and unresponsive to other forms of communication with Mother. N.T., 6/30/16, at 119.

[7] Many of Father's requests centered around L.G.G. as J.W.G., III, was in school. *Id.* at 61.

*(Footnote Continued Next Page)*

the evidence revealed confusion as to the correct mobile phone number for Father at the time. N.T., 7/28/16, at 13-17. Further, and more significantly, Mother offered Father additional custodial time. Mother testified she offered Father Tuesdays, from January through March of 2016, as well as any snow days, with L.G.G. as her parents were in Florida.[8] N.T., 7/27/16, at 9-10.

Likewise, Mother testified that she encouraged contact with Father and Father's extended family on the part of the Children. N.T., 6/30/16, at 193; N.T., 7/27/16, at 42-43. Mother indicated that, while J.W.G., III, no longer attended his custodial time with Father, she advised him that he should, in fact, participate and attend and that she supports and positively encourages L.G.G.'s attendance. N.T., 6/30/16, 194-95.

Moreover, after completing a custody evaluation, Ms. Kissman opined that, despite the hostility and conflict between the parties, L.G.G. was unaffected and "loved both parents fairly equally. . . didn't appear to be choosing sides." *Id.* at 26, 35. Further, while recognizing Father's allegations and potential merit, Ms. Kissman found J.W.G., III, was not alienated. *Id.* at 28, 36. Ms. Kissman testified as follows:

_(Footnote Continued)_ ───────────────

[8] Maternal grandparents typically watched L.G.G. on Tuesdays. As Father did not respond to this offer, Mother enrolled L.G.G. in pre-school on Tuesdays. N.T., 7/27/16, at 9-10.

**Q.** I'd like to direct your attention on that summary of recommendations on Page 24 to the last paragraph, or the second-to-the–last paragraph from the bottom where it starts, father makes allegations, okay.

He obviously was making allegations about [M]other and the paternal [*sic*] family attempting to keep children away, to help manipulate the situation, alienating him. What did you find with regard to that specifically?

**A.** Well, I thought that [*sic*] some merit. But [J.W.G., III,] did not present as an alienated child to me. He was ambiguous, could remember positive memories with the father. Alienated children usually don't. He wanted to repair the relationships [*sic*]. It was one of his wish us [*sic*].

One of the things that makes him sad is he did not have a positive relationship with his father. So I did not find alienation. And, again, that term, you know, is not really recommended by the APA [American Psychological Association] and everyone else. But I did not find true alienation.

*Id.* at 28. This is a clear expression that J.W.G., III, was not alienated. Although Ms. Kissman was not aware that J.W.G., III, had stopped attending his custodial time with Father, she did not suggest that her opinion would be altered. *Id.* at 29. In fact, in response to inquiry from the trial court, Ms. Kissman acknowledged that she would not be surprised if the issues in the relationship between Father and J.W.G., III, existed going back to the previous custody hearing given the lack of therapeutic intervention to repair the relationship. *Id.* at 37, 39. Similarly, she also observed that Mother was the party more willing to communicate. *Id.* at 40.

Hence, as the trial court's determinations are supported by competent evidence in the record, we find no abuse of discretion. Father's claims

related to Mother's alleged failure to foster a relationship between and/or attempts to alienate the Children from Father are, therefore, without merit.

Lastly, we review Father's challenge as to the trial court's review of the best interest factors pursuant to Section 5328(a). Father argues that the trial court ignored evidence which conflicted with its decision. Father's Brief at 19-20. As we construe this issue, Father, in essence, questions the trial court's findings of fact and determinations regarding credibility and weight of the evidence. Under the aforementioned standard of review applicable in custody matters, these are not disturbed absent an abuse of discretion. *See* *E.R.*, 129 A.3d at 527.

Upon review, we discern no abuse of discretion. In the case *sub judice*, as required by law, the trial court carefully analyzed and addressed the factors under Section 5328(a) in considering the Children's best interests. *See* Trial Court Opinion and Order, filed 12/8/16, at 3-13. Thus, after review of the record, we determine that the trial court's findings regarding the custody factors set forth in Section 5328(a) and determinations regarding the Children's best interests are supported by competent evidence in the record. *See E.R.*, 129 A.3d at 527. As we find that the trial court has not made an error of law, and its conclusions are not

unreasonable in light of the sustainable findings of the trial court, we will not

disturb them.[9] *Id.*

Order affirmed; Application to Amend Brief Granted.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/22/2017

_____

[9] Appellant filed with this Court an application to amend his appellate brief. He attached thereto the section of his brief which he wished to amend. We grant the application.